# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PAMELA HENRICKS          )
                                      )
             **Plaintiff,**        )
                                        )
             **v.**                   )     **No. 04 C 8284**
                                        )
**BOARD OF EDUCATION**        )     **Judge Rebecca R. Pallmeyer**
**OF THE CITY OF CHICAGO**     )
                                        )
             **Defendant.**       )

## MEMORANDUM OPINION AND ORDER

Pamela Henricks ("Henricks" or "Plaintiff") brought this suit against Defendant, the Chicago Board of Education ("the Board" or "Defendant"), charging that the Board violated the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101 *et seq.*) and the Illinois Human Rights Act ("IHRA") (775 ILCS 5/2-101, *et seq.*) by failing to accommodate her disability, conversion disorder, and by terminating her because of that disability. Henricks has since died; this case is being pursued by Gerald Henricks as the administrator of her estate. Both sides seek summary judgment. The Board argues that Pamela Henricks was not a qualified individual under the ADA because she has not shown that she was able to perform the essential functions of her job and because she posed a "direct threat" to herself and others in performing her duties. Plaintiff contends that the Board failed to meet its obligation to engage in an interactive process to find a reasonable accommodation for her mobility limitations and that, if provided with a reasonable accommodation, she did not pose a significant risk of harm. For the reasons explained here, the court concludes that disputes of material fact preclude summary judgment in favor of either party.

## FACTS

Henricks began working as a lunchroom attendant for the Chicago Board of Education in 1974. (Pl.'s Statement of Material Facts (hereinafter "Pl.'s 56.1") ¶ 8.) In August 1996, she was promoted to the position of Food Service Compliance Coordinator. (Def.'s 56.1(a)(3) Statement

of Material Facts (hereinafter "Def.'s 56.1") ¶ 2.)  In that position, Henricks was required to travel to more than 100 schools within the Chicago Public School system, access the cafeterias within those schools, inspect and monitor each school's food service procedures for compliance with federal regulations, and complete a written "Compliance On-Site Review Form." (*Id.* ¶¶ 4-7.)

**Henricks's Disability**

In the mid-1990s, Henricks was diagnosed with conversion disorder, a psychosomatic condition in which psychological disorders manifest themselves in physical symptoms.[1] (Pl.'s 56.1 ¶ 11.)  In Henricks's case, the disorder caused spasms in her legs triggered by depression, anxiety, and agoraphobia.  (*Id.* ¶ 17.)  These spasms "substantially affected her ability to . . . walk, ambulate and be mobile." (Def.'s Resp. to Pl.'s Statement of Material Facts (hereinafter "Def.'s Resp.") ¶ 19.)

The parties dispute whether Henricks's disorder affected her ability to drive.  (Def.'s Resp. to Pl.'s Statement of Additional Material Facts (hereinafter "Def.'s Resp. to Add'l Facts") ¶¶ 4-5.)  Henricks claims that she never experienced any spasms when she was sitting down and that she never had any problems driving.  (Pl.'s Statement of Additional Facts (hereinafter "Pl.'s Add'l Facts") ¶ 3.)  She does admit that between December 1992 and May 1993 she drove around a parking lot practicing using a piece of wood on the brakes while driving.  (*Id.* ¶ 4.)  She insists, however, that she never used the piece of wood in traffic and that she burned it in her sister's fireplace in May of 1993 when she realized she did not suffer spasms while she was driving.  (*Id.* ¶ 4-5.)

The Board points to evidence that Henricks did in fact use the board to drive.  Henricks discussed her use of the board both with a board-appointed clinical psychologist and with her own counselor. (Def.'s 56.1 ¶¶ 22-23.) Dr. Robert Heller, the Board's psychologist, reported that "[Henricks] had indicated to me that she's been driving around going from school to school, and

---

[1]     The parties dispute when Henricks began to show symptoms of the disorder. Henricks claims the symptoms of the disorder first began in 1982 (Pl.'s 56.1 ¶ 17), while Defendant claims the "onset" of the disorder did not occur until shortly before 1995 when it was diagnosed. (Def.'s Resp. ¶ 17.)

when she can't move her legs, she uses a two-by-four to push on the gas pedal of the car to keep it going while her feet don't work." (Heller Dep., Ex. C to Def.'s 56.1, at 57:19-24.) Paul Guistolise, Henricks's licensed clinical counselor from 1995 onward, was less conclusive about her actual use of the two-by-four. He reported that Henricks "told me that she had practiced with [the two-by-four] in a parking lot, like a church parking lot or something like that, but that she had never used it in traffic; and to my knowledge, she never did use it in traffic." (Guistolise Dep., Ex. D to Def.'s 56.1, at 55:8-20.)

Henricks first began using a wheelchair in 1995, although she did not use it on a regular basis outside of her home at that time. (Pl.'s 56.1 ¶ 17; Def.'s 56.1 ¶ 12.) The Board was aware of Henricks's difficulties walking prior to August 2001, and "through its employees and agents, observed Plaintiff utilizing a wheelchair, and handrails or additional support to ascend and descend stairs." (Def.'s Resp. ¶ 23.) Moreover, the Board acknowledges that prior to August 27, 2001, its ADA Administrator, Ms. Michael Rowder, had become aware of Henricks's difficulty using the stairs at various facilities. (*Id.* ¶ 27.)

**Request for Accommodation**

Henricks never submitted a written request for an accommodation for her mobility limitations. On May 16, 1999 she did complete a "Request for Reasonable Accommodation" form, but at that time she listed "agoraphobia" and "dissociative disorder NOS [Not Otherwise Specified]" as her disabilities. (Request for Reasonable Accommodation, Ex. 17 to Pl.'s 56.1, at 2.) In this document, Henricks asked for a "Written Job Description," as well as "Written directives from food service management." (*Id.*) In describing why she needed those accommodations, Henricks emphasized that she is "UNABLE TO RECUPERATE PROPERLY DUE TO JOB STRESSORS." (*Id.*) Significantly, in her written request Henricks noted that "No equipment [is] necessary. I provide my own walking aid devices (wheelchair, walker[])." (*Id.*)

On June 29, 1999, Rowder sent Henricks a letter acknowledging that she had received

Henricks's request.  (Receipt of Request for Reasonable Accommodation, Ex. 20 to Pl.'s 56.1.)

Henricks claims that after receiving Rowder's letter, she approached Rowder with a request for

accommodations that did relate specifically to her mobility impairment, such as adding ramps to

assist her in entering and exiting the schools.  (Pl.'s 56.1 ¶ 25.)  According to Henricks, Rowder

laughed at the request and said, "'Who do you think you are that we're going to spend that kind of

money on you?'" (Henricks Dep., Ex. 6 to Pl.'s 56.1, at 123:13-16.)

The Board disputes that Henricks and Rowder ever discussed an accommodation for

Henricks's condition prior to 2001. (Def.'s Resp. ¶ 25.)  To the best of Rowder's recollection,

Henricks did not speak to her about a reasonable accommodation such as ramps prior to August

of 2001.[2]  (Rowder Dep., Ex. 18 to Pl.'s 56.1, at 77:14-18.)  The Board also claims that Henricks

"never felt that she needed accommodations for her medical condition," suggesting that it would

have been unlikely for Henricks to have requested an accommodation from Rowder.  (Def.'s Resp.

¶ 25.)  Moreover, although there is no evidence that Ms. Rowder explored Henricks's motivations

for filing the Request for Accommodation, the Board notes Henricks's testimony that she filed the

request on behalf of herself and the other Food Service Compliance Coordinators because some

were dissatisfied with their supervisor.[3]  (Def.'s 56.1 ¶ 17.) The Board admits, however, that

_____

[2]     Defendant asserts that "Henricks never approached Rowder prior to August 2001." (Def.'s Resp. ¶ 25.) The "Receipt of Request for Reasonable Accommodation" that Rowder signed on June 29, 1999 demonstrates that some communication between Henricks and Rowder took place prior to August 2001.  (Ex. 20 to Pl.'s 56.1; Request for Reasonable Accommodations, Ex. 17 to Pl.'s 56.1, at 2.)  Defendant also asserts in its reply memorandum that Rowder had a conversation with Henricks regarding the 1999 form, although neither of these communications concerned Henricks's mobility concerns. (Def.'s Reply Mem. of Law in Supp. of Its Mot. for Summ. J. (hereinafter "Def.'s Reply") at 6.)

[3]     In her deposition, Henricks says, "This was something I was doing to help us all do our job better because we were all burned out."  (Henricks Dep., Ex. 6 to Pl.'s 56.1, at 129:23-130:1.)  When asked "whether anyone had asked [her] to do this?"  she responded "Yes.  We discussed it among ourselves." (Henricks Dep., Ex. 6 to Pl.'s 56.1, at 130:6-9.)  Later Henricks was asked, "Did any of these persons know that you had filed a request for reasonable accommodation regarding those issues with Michael Rowder?" (Henricks Dep., Ex. 6 to Pl.'s 56.1, at 131:23-132:1.)

(continued...)

Rowder never spoke to Henricks regarding her request and did not open a file or commence an investigation into Henricks's request. (Def.'s Resp. ¶¶ 47-48.)

Henricks asserts that before August 2001, her "immediate supervisor [Maged Hanafi] never talked with [her] about why she was in a wheelchair, her medical condition, or whether it affected her ability to get to schools and do her job." (Pl.'s 56.1 ¶ 39.) The Board points out, however, that Hanafi's supervisor, Inez Susanke, did periodically ask Henricks about her condition and that Henricks "always assured me she could do her job." (Def.'s 56.1 ¶ 13; Susanke Dep., Ex. A to Def.'s 56.1, at 175:20-22.)[4] According to Susanke, in 1999 or 2000, she "offered [Henricks] the help of an additional person, a quality assurance person to help her with some of her inspections and things." (Susanke Dep., Ex. A to Def.'s 56.1, at 123:5-8.) Though Susanke's testimony does not clearly state how Henricks responded to the offer of an assistant, her testimony implies that Henricks occasionally had an assistant helping her "in her office." (*Id.* at 123:17-21.)

**Job Performance and Removal from Active Duty**

Prior to being removed from active service in August 2001, Henricks had some work performance issues, including an attendance problem. (Def.'s 56.1 ¶ 29.) During the last year of her active employment, Henricks was absent seventy-seven times.[5] (*Id.*) Additionally, the Board

---

[3]     (...continued)
 She responded, "They just gave me the knowledge that they were interested in finding out our job description and gave me the freedom to do what I needed to do." (Henricks Dep., at 132:2-4.)
      Although Henricks's Request for Accommodation did not explicitly link her request for a job description and written directives with her conversion disorder, it is undisputed that stress exacerbates the condition. (Def.'s Resp. ¶ 17.) Indeed, as described *infra*, the Board ultimately extended Henricks's medical leave on the basis of a psychiatrist's conclusion that "In view of the stress involved in [her] position . . ., the job demands may be beyond Ms. Henricks's ability to tolerate the level of stress the job requires." (Kelly Report, Ex. H to Def.'s 56.1, at 31.)

[4]     Henricks did not file a 56.1(b)(3)(B) response to the Board's 56.1(a) Statement of Facts, so the Board's factual statement, because supported by the cited testimony, is admitted as true under Local Rule 56.1(b)(3)(C).

[5]     The record does not demonstrate how Henricks's attendance record compares to
(continued...)

claims that Henricks submitted inaccurate or false reports; the reports reflected that she had visited more than five schools per day, which the Board says is physically impossible, and that she had conducted on-site inspections for days when the school was not in session, including weekends and holidays.[6] (*Id.*)

In July 2001, Henricks filed a worker's compensation claim for a work-related injury that occurred while she was attempting to leave a school by crawling down a flight of stairs. (Def.'s 56.1 ¶ 18; Smith Dep., Ex. 11 to Pl.'s 56.1, at 32:1-8.) In the course of investigating the report for Henricks's injury, Ken Smith, the Board's Manager of Loss Prevention, came to believe that Henricks sometimes used a two-by-four to operate her car.[7] (Def.'s 56.1 ¶ 18.) In August 2001, Smith convened a meeting with Henricks's supervisor and representatives of the Board's ADA, Employee Health Service, and Labor Relations offices. (*Id.* ¶ 19.) At the meeting, the attendees expressed concern about the Board's liability and the possible danger created by Henricks's

---

[5] (...continued)
that of other employees. Henricks has presented evidence that her attendance record is poor because she had to leave work fifteen minutes early each Monday to visit her therapist but was docked half a day because she was listed as a salaried employee. (Henricks Dep., Ex. 6 to Pl.'s 56.1, at 172:11-174:2.) Being docked for half a day every Monday would account for only 52 of the reported 77 absences.

[6] Susanke said that Henricks explained this inconsistency to Hanafi by stating that she did not complete the forms on the day that she visited the school. (Susanke Dep., Ex. A to Def.'s 56.1, at 41:12-13.) Susanke further stated that this was not an acceptable excuse "[b]ecause you're supposed to complete the form the day you do the visit." (*Id.* at 41:17-18.)

[7] Defendant claims "Henricks had told an adjuster that she sometimes use [sic] a two-by-four piece of wood to operate the gas and break controls of her car." (Def.'s 56.1 ¶ 18.) The adjuster's report is not in the record, but Smith testified that he initiated the investigation into this issue after reading the report and "discover[ing] that she was using a two-by-four to move around in her car." (Smith Dep., Ex. G to Def.'s 56.1, at 32:1-8.) Henricks, however, claims that she told the adjuster that she had previously practiced driving using the piece of wood, but that "[i]t wasn't needed and it never was used in a driving situation." (Henricks Dep., Ex. 6 to Pl.'s 56.1, at 118:19-119:4.)

mobility limitations and driving capabilities, as well as possible accommodations.[8] (Pl.'s 56.1 ¶ 28.) At the conclusion of the meeting, the attendees "decided to refer Henricks for a health examination pursuant to the Board's fitness for duty policy." (Def.'s 56.1 ¶ 19.)

On August 24, 2001, Susanke met with Henricks and told her that there were concerns regarding her driving and that she was being referred to a psychologist for evaluation. (Def.'s 56.1 ¶ 20.) On August 27, Dr. Robert Heller, a clinical psychologist, examined Henricks to determine her psychological fitness. (Def.'s 56.1 ¶ 21.) In a report prepared after his examination, Heller wrote that given "her resolve and following through with treatment recommendations, it is expected she would be able to work. At this time it is recommended that she attend a partial program and work or go on medical leave from work." (Heller Fitness for Duty Evaluation, Attached to Ex. C of Def.'s 56.1, at 4.) Heller added, "While she is intellectually capable of performing her job, she currently makes judgement [sic] that she would endanger herself or others due to her conversion disorder of immobilizing her legs." (*Id.*) Dr. Heller's concern about Henricks's judgment was based on what he records as her acknowledgment "that she has used a two-by-four piece of wood to assist her in pushing the gas pedal in case her legs would go out." (*Id.* at 3.) In his deposition, Heller testified that at the time he saw Henricks, he did not believe "she was able to perform the essential functions of her job." (Heller Dep., Ex. C to Def.'s 56.1, at 52: 10-16.)

On October 4, 2001 Dr. Damon Arnold, a medical doctor hired by the Board, examined Henricks for her physical fitness for duty. (Def.'s 56.1 ¶ 21.) Dr. Arnold reported to the Board that Henricks would "require follow-up by Dr. Heller for evaluation and treatment," that she is "off duty due to non-work related condition," and that she "[n]eeds medical clearance from private physician

---

[8]     The Board disputes this assertion insofar as it assumes that reasonable accommodations in fact exist. (Def.'s Resp. ¶ 28.) Rowder testified, however, that during the meeting, she asked Susanke "whether [they] could assign [Henricks] to first floor cafeterias only." (Rowder Dep., Ex. 18 to Pl.'s 56.1, at 66:20-24.) Moreover, at some point before or after that meeting, Rowder did contact Susanke "regarding possible open positions requiring less field work, for which [Henricks] was qualified." (Pl.'s 56.1 ¶ 49.)

prior to return to work." (Arnold Letter, Ex. 15 to Pl.'s 56.1.)

**Medical Leave**

In a letter to Henricks dated October 26, 2001, Wendy Haas, the Board's Director of Employee Health Services, informed Henricks that she was being placed on medical leave. (Haas Letter, Ex. 9 to Pl.'s 56.1.) Haas's letter explained that Henricks could contest Dr. Heller's finding that she "should not return to work in [her] capacity as a Food Service Compliance Coordinator"[9] by presenting medical evidence to rebut it. (*Id.*) Before making the decision to place Henricks on leave, Haas did not communicate with Rowder, the Board's ADA Administrator, about possible accommodations. (Def.'s Resp. ¶ 42.) Henricks claims that she called various employees of the Board to inquire about her return to work, but that her phone calls were not returned. (Pl.'s 56.1 ¶ 44.)

On or about January 4, 2002, Henricks provided the Board with letters from her own psychotherapist, Paul Guistolise, and her medical doctor, Timothy Cullinane, both stating their belief that Henricks was fit to perform the duties of her job. (Def.'s 56.1 ¶ 25.) Without referencing Guistolise or Cullinane's letters, Haas repeatedly extended Henricks's leave of absence by sending her standard extension letters that stated that Henricks needed to present "a statement from her physician releasing her to return to work."[10] (Haas Dep., Ex. 10 to Pl.'s 56.1, at 90:11-92:5.) First, on January 3, 2002, Haas sent Henricks a letter extending the leave of absence from January 28, 2002 to February 24, 2002. (*Id.* at 90:19-91:8.) On February 6, 2002, Haas sent Henricks another letter extending her leave of absence, again informing her that to be reinstated, Henricks had to provide a statement from her doctors. (*Id.* at 92:20-93:5.) On April 3, 2002, Haas yet again

---

[9] Haas candidly admits that this was "not exactly" what Dr. Heller had said in his report. (Haas Dep., Ex. 10 to Pl.'s 56.1, at 43:24-44:2.)

[10] Asked whether Henricks had supplied a "statement from her physician" after the April 3 letter, Haas admitted, without further explanation, that she had done so and had not been reinstated. (Haas Dep., Ex. 10 to Pl.'s 56.1, at 93:18-20.)

extended Henricks's leave and instructed her that a statement from her physician would be required prior to reinstatement. (*Id.* at 93:11-17.)

In March 2002, prior to the April 3 letter extending Henricks's leave, Henricks was asked to submit to a "two-part functional capacity evaluation." (*Id.* at 94.) Dr. Arnold and Martin Gonzalez, a case manager for the Board, recommended that Henricks return to work with the following accommodations: 1) that she stand only for short periods of time; 2) that she not carry items; and 3) that she use an elevator whenever possible. (Pl.'s 56.1 ¶ 31.) In early April, Gonzalez evaluated Henricks's driving abilities, including her ability to "transfer her wheel chair to her automobile," to maneuver the steering wheel, and to operate the car's foot controls during a driving simulation. (Addendum to Work Capacity Initial Report, Ex. 30 to Pl.'s 56.1.) Over sixty minutes of simulated driving, Henricks "repeatedly used the accelerator and brake pedal without assistive devices." (*Id.*)

**Possible Accommodations**

During the course of discovery, the parties have also discussed Henricks's use of public transportation as a possible accommodation. The Board contends that Henricks has effectively admitted that public transportation was not a possible alternative to driving "because the way [her] district is cut out at the city edges, bus lines do not run that far."[11] (Henricks Dep., Ex. 6 to Pl.'s

---

[11]     Henricks's reasons for claiming that public transportation would not have allowed her to access the school are less clear. (Henricks Dep., Ex. 6 to Pl.'s 56.1, at 104:23-105:23.) Her testimony on this issue was as follows:

Q.     Why didn't you use public transportation?
A.     Public transportation in Englewood? I'm not a fool.
Q.     Would it have been possible for you to use public transportation?
A.     Not safely.
Q:     Would it have been possible?
A:     No, because they are not all wheelchair accessible. Most schools are inside the busy streets, not on the busy streets, and it would be a safety hazard. So I would be a fool to use anything other than my car.
Q.     And that would be because of the wheelchair that you wouldn't be able to access the schools from public transportation?
A.     Well, if I have to walk two blocks, I'm going to be walking two blocks slow.

(continued...)

56.1, at 104:23-105:23.)  Plaintiff's supervisors testified, however, that they believed the schools on her route were in fact accessible by public transportation.  (Hanafi Dep., Ex. 13 to Pl.'s 56.1, at 88:17; Susanke Dep., Ex. 14 to Pl.'s 56.1, at 52: 10-11).  As an alternative that would permit Henricks to continue driving, the Board's employees admit that hand controls are sometimes used to allow individuals with disabilities to drive cars.  The Board's Director of the Bureau of Employee Health Services Wendy Haas testified, "I don't know how easy it is, but I know that often like when I was a case manager [for a different employer], if someone had a catastrophic injury, they would be evaluated and usually buy a vehicle that was equipped for that."  (Haas Dep., Ex. 10 to Pl.'s 56.1, at 58:22-59:10.)  Dr. Robert Heller, the Board's psychologist, testified that he had previously recommended vehicle accommodations for patients and referred them to the University of Illinois engineering department for assistance.  (Ex. 16 to Pl.'s 56.1, at 58:6-59:5.)

Eventually, according to Haas, the Board reevaluated Henricks to determine if she was "fit or not" for duty.  (Haas Dep., Ex. 10 to Pl.'s 56.1, at 75:12-19.)  On June 6, 2002, Dr. Jonathan Kelly, an independent forensic psychiatrist hired by the Board, evaluated Henricks and reported that she "remains symptomatic of her Conversion Disorder, limiting her ability to fulfill her current physical job requirements." (Kelly Report, Ex. H to Def.'s 56.1, at 31.)  Dr. Kelly concluded that "in view of the stress involved in Ms. Henricks's position . . . , the job demands may be beyond Ms. Henricks['s] ability to tolerate the level of stress the job requires."  (*Id.*)  Based on these findings, Dr. Kelly concluded Henricks "is not physically fit to resume her job responsibilities at present."  (*Id.*)

---

[11]     (...continued)
So why wouldn't I drive my car up to the school and go right into the closest door?

Q.     I'm not asking you why you would do one or the other.  I'm just asking you whether it would have been possible.

A.     It would have been – no, it wouldn't have been possible because the way my district is cut out at the city edges, bus lines do not run that far.

The Board then extended Henricks's leave of absence through October 25, 2006. (Def.'s Answer, Ex. 19 to Pl.'s 56.1 ¶ 18.) On March 19, 2002, Henricks filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission ("EEOC"). (Pl.'s 56.1 ¶ 4.) The IDHR dismissed Henricks's claims and the EEOC sent her a "Notice of Right to Sue" letter on September 27, 2004. (Pl.'s 56.1 ¶¶ 5-7.) Henricks subsequently instituted this action. In April 2007, Henricks died of coronary artery disease without ever having returned to active employment with the Board. (Pl.'s 56.1 ¶ 9; Henricks Death Certificate, Ex. 29 to Pl.'s 56.1.)

**DISCUSSION**

Plaintiff Henricks claims the Board of Education violated the Illinois Human Rights Act and the Americans with Disabilities Act by failing to accommodate her disability. Both sides argue that the uncontested facts require that summary judgment be entered in their favor. Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 950 (7th Cir. 2000) (quoting *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999)). When, as in this case, both parties have moved for summary judgment, the court considers the motions at the same time, "extending to each party the benefit of any factual doubt when considering the other's motion." *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N. D. Ill. 1992), *aff'd* 9 F.3d 1198 (7th Cir. 1993).

Henricks's IHRA claim requires little discussion. The IHRA provides generally that "no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in [the] Act." 775 ILCS 5/8-111(D); *see also Talley v. Washington Inventory Serv.*, 37 F.3d 310, 311 (7th Cir. 1994) ("The Illinois Human Rights Act provides a comprehensive scheme of

11

remedies and administrative procedures to redress human rights violations . . . ."). After the Department of Human Rights dismissed her charge of discrimination, Henricks's recourse was to proceed to the Illinois Human Rights Commission. 775 ILCS 5/7A-102(B) ("the charge of civil rights violation will be dismissed with prejudice . . . if a written complaint is not timely filed with the Commission . . . .").[12] Accordingly, this court lacks subject matter jurisdiction and must dismiss the IHRA claim.

In any event, Henricks's IHRA claim appears on its merits to be identical to her claim under federal law. The Americans with Disabilities Act provides that a covered employer shall not "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 121112(a). Discrimination includes failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 121112(b)(5)(A). To succeed on a claim for failure to accommodate, an employee must show that "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001)). The third element "requires that employer and employee engage in an interactive process to determine a reasonable accommodation." *Sears*, 417 F.3d at 797 (quoting *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998)). "If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process." *Sears*, 417 F.3d at 797 (citing *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)).

---

[12] The IHRA has since been amended and now permits a claimant to file an action in state court, in certain circumstances. *See* Public Act 95-243, § 5 (2007), 775 ILCS 5/7A-102(B), (G)(2).

## I.    Qualified Person with a Disability

Plaintiff bears the burden at trial of establishing that she is a "qualified individual with a disability"—that is, "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such an individual holds."  42 U.S.C. §12111(8).  Plaintiff also bears the burden of showing that the employer was aware of her disability and still failed to reasonably accommodate it.  *Sears*, 417 F.3d at 803; *Hoffman*, 256 F.3d at 572. The parties agree that Henricks's conversion disorder qualifies as a disability under the ADA,  (Def.'s Mem. of Law in Opp'n. to Pl.'s Mot. for Summ. J. (hereinafter "Def.'s Opp'n.") at 2) and that the Board was aware, prior to August 27, 2001, that Henricks used a wheelchair and had difficulty navigating stairs and that she may have had have difficulty driving.  (Def.'s Resp. ¶ 27.)

The parties disagree, however, about whether Henricks was qualified, with or without accommodation, to perform the essential functions of her job as Compliance Coordinator. The job had four essential functions: 1) to travel to the schools within the coordinator's defined area,[13] 2) to access the cafeterias within those schools, 3) to conduct inspections of the cafeterias and each school's lunch applications, and 4) to complete written reports.  (Def.'s 56.1 ¶¶ 4-7.)  Henricks was physically capable of conducting the inspections and completing the required reports.[14]   (Def.'s Mem. of Supp. at 4-5.)  What is disputed is whether Henricks was qualified to safely travel to the schools and access their cafeterias with or without an accommodation.

---

[13]    The parties spend considerable time arguing over whether one of Henricks's essential job functions was to drive to the schools she was to inspect.  While Henricks's job description as a Compliance Coordinator did not require that she drive (Def.'s Resp. ¶15), she clearly somehow had to travel to the schools she was to inspect.

[14]    Although Defendant suggests that Henricks had not satisfactorily performed the duties of her job during the year before she was placed on medical leave, Defendant does not claim that the unsatisfactory performance was the result of an inability to perform those job functions. (Def.'s 56.1 ¶ 29.)

A.    Travel to Schools

The inspection and reporting duties of the Compliance Coordinator position required Henricks to travel to more than 100 school cafeterias each school year.  (Def.'s 56.1 ¶ 4.) Defendant argues that Henricks was not qualified to travel to the schools because she posed a direct threat to herself and others by driving and because she cannot show that a reasonable accommodation would have allowed her to safely travel to the schools.  (Def.'s Mem. of Supp. at 4; Def.'s Reply at 3.)  Plaintiff insists that Henricks's condition did not affect her while driving and that she therefore did not pose a direct threat.[15]  (Pl.'s Resp. at 7-9.)  Alternatively, Plaintiff argues that Henricks's condition could have been accommodated: she could have traveled to the schools using public transportation or using other accommodations that would have eliminated the risk she posed.  (Pl.'s Resp. at 4-5.)

An employee is not a qualified individual under the ADA if she poses "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."  *Branham v. Snow*, 392 F.3d 896, 905-06 (7th Cir. 2004) (quoting 29 C.F.R. § 1630.2(r)).  To determine whether a risk is significant, courts look at four factors: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm.  29 C.F.R. § 1630.2(r); *see also Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001). Defendant bears the burden of proving that Henricks posed a significant risk that could not be

---

[15]    Plaintiff first attempts to argue that "driving is not an essential job function of a Food Service Compliance Coordinator and therefore cannot support a direct threat defense." (Pl.'s Resp. at 2.)  In support, Henricks points to *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208 (2d Cir. 2001), where the court held that an employee who could not obtain a driver's license and whose job description required that she drive to make bank deposits was qualified to perform this essential task without driving if she could complete the task by walking. *Id.* at 217. Here, however, Plaintiff has not proven that she could have satisfactorily performed her job functions without driving, and so has not established "as a matter of law" that her performance of her job functions did not pose a direct threat. (Pl.'s Resp. at 4.)

eliminated by a reasonable accommodation. *Branham*, 392 F.3d at 906-07 (citing *Dadian v. Vill. of Wilmette*, 269 F. 3d 831, 841 (7th Cir. 2001)). The "direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job' . . . . " *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)).

Defendant claims that Henricks's conversion disorder was episodic and unpredictable and therefore could have affected her ability to safely drive. (Def.'s Reply at 4.) As evidence, the Defendant points to the varied statements allegedly made by Henricks to her doctors, informing them that she kept a piece of wood in her car to manipulate the pedals of it in case she had a spasm while driving. (Def.'s 56.1 ¶¶ 22, 23.) Plaintiff contends her disorder never caused her legs to spasm while she was sitting, and that although she practiced driving with a piece of wood in a parking lot in 1992 and 1993, she discarded it after concluding that her leg spasms occur only while she is standing. (Pl.'s Resp. at 7-8; Pl.'s Add'l Facts ¶¶ 5, 6.) Henricks effectively denies having told her doctors that she continued to keep the piece of wood in her car or suggests that they misunderstood her when she described how she had practiced with the piece of wood in 1992 and 1993. In sum, there are disputes about whether the conversion disorder caused leg spasms while Henricks was driving and whether she did or did not keep a piece of wood in the car to assist her in the event of a spasm. And assuming that Henricks did pose some risk while driving, neither party appears to have presented any evidence concerning the duration of the risk, its severity, or the likelihood and imminence of the harm that could result from Henricks's driving. *See* 29 C.F.R. § 1630.2(r).

Defendant relies on *Timmons v. General Motors Corp.*, 469 F.3d 1122 (7th Cir. 2006), to support its "direct threat" defense. (Def.'s Mem. of Supp. at 7, 10-11; Def.'s Reply at 4.) In *Timmons*, the court upheld a grant of summary judgment in favor of the defendant where the

plaintiff claimed disparate treatment because of a disability that his employer believed affected his driving. *Timmons*, 469 F.3d at 1123. In a disparate treatment claim, an employer's motivations are relevant; thus, evidence that the employer was motivated by its belief that Timmons posed a threat—not by the disability itself—supported summary judgment for the employer. *Id.* at 1129. In a claim for failure to accommodate, however, the trier of fact is required to determine whether a direct threat actually exists, and if so, whether that threat can be eliminated through accommodation. *Branham*, 392 F.3d at 905-06 (a direct threat defense is available only if the employee poses a substantial risk that cannot be eliminated by a reasonable accommodation); 29 C.F.R. § 1630.2(r). While a defendant has the burden of proving a plaintiff poses a direct threat, *Branham*, 392 F.3d at 906-07, a plaintiff bears the burden of establishing the existence of a reasonable accommodation. *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002).

Disputes of fact remain on both of these issues. During Henricks's tenure with the Board, the parties never discussed possible accommodations for driving, and Henricks insisted she was capable of driving without any accommodations. Plaintiff now urges that any risk Henricks may have posed could have been eliminated by the use of public transportation or modifications of her car for hand controls. (Pl.'s Resp. at 4.) Defendant is correct that Henricks testified that public transportation would not have been an effective option for her (Def.'s 56.1 ¶ 10; Henricks Dep., Ex. 6 to Pl.'s 56.1, at 104:23-105:23), but her own supervisors testified that all of the schools in Henricks's territory were in fact accessible via public transportation. (Pl.'s Add'l Facts ¶ 1.) Just as there was no discussion of public transportation during Henricks's tenure, the parties also never explored the possibility of modifications to Henricks's vehicle to permit her to use hand controls. Again, she believed no such modification was necessary, but Wendy Haas, the Board's Director of the Bureau of Employee Health Services, testified that such modifications were available and effective. In short, questions of fact remain concerning whether Henricks posed a direct threat and, if so, whether a reasonable accommodation was available to eliminate the threat. Accodingly,

neither side is entitled to summary judgment on this issue.

**B.      Access to Cafeterias**

In addition to traveling to various schools around the city of Chicago, Henricks was required to access the cafeterias in each school to "monitor practices regarding free and reduced meal applications, food service and sanitation." (Pl.'s 56.1 ¶ 14.) It is undisputed that approximately half of the schools in Henricks's region had cafeterias that were not on the first floor and that three-quarters of them lacked elevators. (Def.'s 56.1 ¶ 9.) Noting that Henricks admitted she suffered an injury while attempting to access a cafeteria, Defendant argues that Henricks was a danger to herself. Plaintiff notes that for five years after the onset of her disability, she successfully accessed cafeterias without an accommodation and argues that if she did pose a danger, that danger could have been eliminated with an accommodation.

It appears from the record that Henricks, who was wheelchair-bound, had significant difficulty accessing the cafeterias she was required to inspect. In July of 2001, Henricks injured her leg as she crawled on a school stairway while dragging her wheelchair behind her. (Smith Dep., Ex. G to Def.'s 56.1, at 7:19-8:23.) Plaintiff has not suggested that the injury was merely a random accident or was insignificant, and it is undisputed that Henricks's condition had grown worse over time. (Def.'s 56.1 ¶ 12.) As noted, Henricks's only formal request for accommodation referred only to stress–she claimed that she did not need any physical assistance, and the parties did not discuss any accommodation for her mobility problems. Henricks now identifies several possible accommodations, including: (1) she could have been permitted to use the ramps that are furnished on voting day to make schools accessible to disabled voters; (2) her route could have been limited to handicap-accessible buildings; (3) she could have been transferred to a vacant position that required less travel; and (4) she could have had an assistant carry her wheelchair. (Pl.'s Mem. of Supp. at 9-10.)

Whether these accommodations were feasible and whether they would have been effective

is disputed. There is no evidence that the ramps provided to voters would have been available and effective to enable Henricks to access the cafeterias. Defendant notes that Henricks herself testified that assigning her to a route limited to schools that have ground-level cafeterias would have inconvenienced her coworkers, but the context of that testimony was Plaintiff's insistence that she could perform her job without assistance.[16] Defendant argues that there was no vacant position available for which Henricks was qualified (Def.'s Opp'n. at 5), but it admits that in March 2004, the Board failed to consider placing Henricks in a vacant position as a Field Operations Manager, "a position that required less field work and for which Plaintiff was fully qualified."[17] (Def.'s Resp. ¶ 50.) Defendant also challenges the notion that Plaintiff might have relied on an assistant to carry her wheelchair because Henricks has not presented any evidence that an employee could have done so "in the context of [his] other duties." (Def.'s Reply at 5.) It is undisputed, however, that the Board had previously "provided other wheelchair-bound employees with a personal aide." (Def.'s Resp. ¶ 38.) Nor has Defendant explained why teacher's aides, clerical staff, security guards, or the cafeteria workers within each school could not have assisted Henricks for the few minutes on the one day each year she inspected that school's cafeterias.

Neither side is entitled to summary judgment regarding the availability of reasonable accommodations for Henricks's visits to cafeterias.

---

[16] Asked whether it would have been possible to alter her route in this fashion, Plaintiff testified,

It is very possible. It would be very possible, but I would not request it. I would say it would be unfair to the other supervisors, because then instead of keeping us in local areas, it would put us all over the map. And I had no problem doing my job . . . . And, yes, they could have done that. They could have cherry-picked everything out, and it would have been more around – it would have been chaos for my – both for myself and for my coworkers. And it would not have been fair because it would have been picking out – I would have the newest schools  . . . .

(Henricks Dep., Ex. B to Def.'s 56.1, at 170:2-24.)

[17] It is uncontested that at the time the Defendant placed Henricks on disability leave, no other positions were available for which Henricks would have been qualified. (Def.'s 56.1 ¶ 24.) Plaintiff has not suggested that any other positions became available prior to March 2004.

## II.    The Interactive Process

The ADA requires that an employer and a disabled employee engage in an interactive process to find a reasonable accommodation. *Sears*, 417 F.3d at 797; *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000). Employers must "engage in a flexible give-and-take" with the employee to determine whether a reasonable accommodation can be found. *Sears*, 417 F.3d at 805. "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." *Id.* Courts will look at whether the parties participated in the process in good faith in determining which party, if either, caused the breakdown. *Beck*, 75 F.3d at 1135.

Although the parties have devoted substantial attention to the issue of accommodation in discovery and in their briefs, the record shows that very little attention was paid to this issue during Plaintiff's tenure with the Board. Plaintiff claims that after she filed a formal Request for Accommodation in 1999, she contacted the Board's ADA Administrator Michael Rowder and made an explicit request for accommodation, at which Ms. Rowder laughed. (Pl.'s 56.1 ¶ 25.) Defendant denies that any such conversation occurred, noting Henricks's own testimony that "I don't feel I ever needed accommodations. I was doing just fine." (Def.'s Reply at 6; Henricks Dep., Ex. B to Def.'s 56.1, at 106:3-4.) For its part, Defendant asserts that "Henricks never approached Rowder prior to August 2001," (Def.'s Resp. ¶ 25), but also acknowledges that Ms. Rowder had a conversation with Henricks regarding the Request for Accommodation form she submitted in 1999 complaining about the lack of directives that her and her coworkers received from their superiors. (Def.'s Reply at 6.)

A reasonable jury could find, on this record, that Henricks did make an explicit request for an accommodation and was ignored. Alternatively, the jury might understand Henricks's 1999 Request for Accommodation as nothing more than a complaint against her supervisor. A question of fact thus remains as to whether Henricks requested an accommodation and as to how Rowder

responded to it. Although Plaintiff asserts that her direct supervisor, Maged Hanafi, did not discuss the matter with Henricks, Plaintiff does not challenge Defendant's evidence that between 1999 and 2000, Hanafi's supervisor, Susanke, did occasionally speak to Henricks about her condition to see if she needed any help. (Def.'s 56.1 ¶ 13.) It is also uncontested, however, that "Henricks's condition became progressively worse from 1995 through 2001 as she experienced mobility problems due to spasms in her legs." (Def.'s 56.1 ¶ 12.) Even if the Board made an effort to clarify Henricks's condition in 1999 or 2000, as Henricks's condition changed and as the Board became aware of these changes, it had a duty to clarify its understanding and determine whether an accommodation was needed prior to suspending and terminating her employment. *See Sears*, 417 F.3d at 797.

In July or August 2001, the Board came to believe that Henricks had been using a piece of lumber to drive her car. Once this issue emerged, Plaintiff asserts, Defendant is responsible for the breakdown in the interactive process in that it made no effort to investigate possible accommodations with the doctors who examined Henricks and never pursued the accommodations recommended by Dr. Arnold. (Pl.'s Reply at 7.) Instead, Board officials convened internally and, after an evaluation by Dr. Heller, placed Henricks on medical leave. Additionally, the Board made no response when Plaintiff furnished the requested statements from her doctors that Henricks was capable of returning to work, other than simply continuing her medical leave.

Defendant contends any effort it might have made to accommodate Henricks's disabilities would not have mattered because Henricks was "unwilling to exercise care" and would have rejected the accommodation. (Def.'s Mem. of Supp. at 7 (citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 868 (7th Cir. 2005).) In *Hammel*, the court affirmed summary judgment against the plaintiff's disparate treatment ADA claim because plaintiff was "an insubordinate, reckless, and thus undesirable employee," and affirmed summary judgment against his failure to accommodate claim because he "failed to recommend to this court reasonable accommodations

that would allow him to perform the essential duties required for employment." *Hammel*, 407 F.3d at 868. The plaintiff repeatedly ignored instructions by his supervisors to follow basic safety procedures in the factory, and "no accommodation would make a difference for an employee unwilling to exercise care, accept instruction, or take responsibility for getting his work done properly." *Id.* (citation omitted). There is no evidence in this case of Henricks's ignoring direct orders from her supervisor. Defendant instead suggests that Henricks's use of a piece of wood to help her drive supports the inference that she would not have availed herself of any accommodation offered her. (Def.'s Mem. of Supp., at 5.) Plaintiff steadfastly denies that Henricks used a two-by-four to drive and, in any event, her alleged exercise of bad judgment in one arena does not satisfy the court that she is, as a matter of law, responsible for the breakdown of the interactive process in this case.

## CONCLUSION

The motions for summary judgment [109, 113] are denied. The parties are encouraged to discuss a possible resolution of this case. Status conference is set for Monday, September 15, 2008, at 9:00 a.m.

ENTER:

Dated: September 4, 2008

_____

REBECCA R. PALLMEYER
United States District Judge